In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-08-00187-CV


____________________



PAUL OGDEN FONDREN, Appellant



V.



KIMEN REBECCA FONDREN, Appellee






On Appeal from the 1-A District Court 


Tyler County, Texas


Trial Cause No. 20,589






MEMORANDUM OPINION


 Appellant, Paul Fondren, appeals the trial court's judgment granting a divorce, a
division of marital property and awarding child support. Appellant contends that the trial
court erred in permitting certain expert testimony as to the value of the parties' home and 
in finding that appellant was intentionally underemployed or unemployed at the time of the
divorce. We affirm. 


FACTUAL BACKGROUND


 Paul and Kimen Fondren were married in 1991. Two children were born of the
marriage. When the couple married they moved to Fayetteville, North Carolina, where Paul
was in the Army and stationed at Fort Bragg. Paul was discharged from the Army in 1994
and completed his college education at Fayetteville State University where he received a
degree in criminal justice. Kimen worked in property management while Paul attended
school. After graduating from college, Paul attended the police academy and, thereafter, was
hired by the City of Fayetteville Police Department. 

 In 2002, Paul went to work overseas with a company called DynCorp. While
employed with DynCorp, Paul was stationed in Kosovo as a deputy commander, training the
Kosovo Police Service to become law enforcement. After leaving DynCorp, Paul went to
work with Triple Canopy, a company that provides close protection security. While working
for Triple Canopy, Paul was stationed in Iraq. Eventually, Paul left Triple Canopy and went
to work for Blackwater, another close protection security company. While working overseas,
Paul was only home ninety days out of the year. Paul made significantly more money
working overseas than he made working for the Fayetteville Police Department. Evidence
admitted at trial showed that in 2005 Paul earned $124,143.50; in 2006, $149,716; and in
2007, $164,000.

 After Paul went to work overseas, Kimen and the children moved from Fayetteville
back home to Tyler County so that they could be near Paul and Kimen's families. 
Eventually, Paul and Kimen built a house a few miles from both of their parents. In June
2007, Paul told Kimen that he wanted a divorce. Kimen wanted to work things out with
Paul, but eventually found out that Paul was having an affair with a co-worker with whom
he was serious. Paul did not deny the affair when confronted by Kimen. This divorce
lawsuit was filed on August 3, 2007 and tried in a non-jury proceeding on February 22,
2008. At the time of trial, Paul was alleged to be unemployed, having separated from
Blackwater on November 10, 2007.

PROCEDURAL BACKGROUND


 The trial court granted the divorce and appointed Paul and Kimen joint managing
conservators of the children with Kimen having the right to determine the primary residence
of the children. The trial court established visitation and ordered Paul to pay Kimen monthly
child support in the amount of $1,250. The trial court awarded the parties' home to Kimen,
but set forth a certain amount of equity each party would receive if the house were ever sold,
on a diminishing sliding scale. After request by Paul, the trial court filed separate findings
of fact and conclusions of law. 

 Paul appeals the trial court's judgment and argues that the trial court erred in
admitting the opinion testimony of Bud Jones on the value of the parties' home over
appellant's objections, and in finding that appellant was intentionally underemployed as there
was no pleading to support the trial court's finding, and in finding that appellant was capable
of earning a net of $5,000 a month, and in setting child support based on that amount. 

ADMISSION OF THE TESTIMONY OF BUD JONES


 Bud Jones, a licensed real estate broker for thirty-one years in Tyler County, was
called by appellee to testify at trial regarding the value of the parties' home. Jones testified
that he did appraisals until roughly the mid-80s and as a part of his job, he regularly inspects
real property to determine the fair market value of the property in order to list the property
for sale. 

 Jones valued the parties' home at $235,000. While Jones explained the basis of his
opinion included comparable sales in the area of the property, Jones did not produce
documented evidence of such comparable sales at trial, asserting a privacy policy. Counsel 
objected that Jones' testimony was not relevant or reliable because it was not based on
comparable sales and Jones had " not demonstrated that he used [the] comparable sales
approach in establishing the value." Counsel argued that Jones had not told the Court what
comparable sales he relied upon and counsel could not cross examine him in that regard.

 Over objection by counsel, the Court allowed the testimony noting counsel's objection
went more to the witness' credibility instead of admissibility because Jones' opinion was
merely cumulative of other evidence of the value of the home. (1) Kimen had already testified,
with no objection, that the fair market value of the home was $235,000. When Kimen's
inventory was admitted into evidence she testified that she characterized the parties' home
on her inventory as community property with a fair market value of $235,000. In its findings
of fact the Court stated, "Exhibit 1 attached hereto and incorporated herein sets out the
Court's factual findings regarding characterization of property, fair market value of the assets
and liabilities of the community estate and the award of property." Exhibit 1 listed the fair
market value of the home at $235,000. 

 The Texas Family Code obligates the trial court to divide the marital estate, upon the
divorce of the parties, "in a manner that the court deems just and right, having due regard for
the rights of each party and any children of the marriage." Tex. Fam. Code Ann. § 7.001
(Vernon 2006). The court is not obligated under the statutory provisions of the Family Code
to divide the property equally. Tate v. Tate, 55 S.W.3d 1, 10 (Tex. App.--El Paso 2000, no
pet.). In Texas the law is well settled that a trial court has great discretion in determining
how to divide the marital estate. Gardner v. Gardner, 229 S.W.3d 747, 756 (Tex. App.--San
Antonio 2007, no pet.) (citing Tenery v. Tenery, 932 S.W.2d 29, 30 (Tex. 1996)); see also
Brown v. Brown, No. 09-06-473 CV, 2007 WL 2324303 (Tex. App.--Beaumont Aug. 16,
2007, no pet.). There are a number of factors which may justify a disproportionate division
of the marital estate. Murff v. Murff, 615 S.W.2d 696, 698-99 (Tex. 1981). For example,
a court may consider disparity of income or earning capacities of the parties, the parties'
capacities and abilities, benefits which the party not at fault would have derived from
continuation of the marriage, business opportunities, education, relative physical conditions, 
relative financial condition and obligations, disparity of ages, size of separate estates, and the
nature of the property. Id.

 Appellant argues on appeal that the trial court erred in admitting the testimony of 
Jones, and therefore, there is no evidence to justify the value of the home found by the trial
court, or in the alternative, the court's finding as to the value of the home is against the great
weight and preponderance of the evidence and lead to an improper verdict. However,
appellant does not argue that the trial court abused its discretion in its division of the marital
estate. In this case, a mistake in the value of the parties' home would not require reversal
unless appellant contends and demonstrates that the property division made by the trial court
was so unjust and unfair as to constitute an abuse of discretion. See generally Thomas v.
Thomas, 603 S.W.2d 356, 358 (Tex. Civ. App.--Houston [14th Dist.] 1980, writ dism'd)
("The mere fact that certain assets were either undervalued or overvalued does not, in and
of itself, constitute an abuse of discretion."). "Absent evidence showing an abuse of
discretion, the trial court's division of a marital estate will not be disturbed on appeal." 
Brown, 2007 WL 2324303, at *2 (citing Murff, 615 S.W.2d at 698). 

 The trial court made multiple findings of fact, none of which are challenged on
appeal, which would justify a disproportionate award of the marital estate to Kimen. The
trial court set forth the following relevant findings of fact:

 4.2 The Court also finds that the marriage broke up because of the fault of
Paul Fondren, specifically including adultery.


 4.3 The Court finds that Kimen Fondren has lost benefits that she may have
derived from the continuation of the marriage[.]


 4.4 The Court finds that a disparity of earning power exists between Kimen
Fondren and Paul Fondren and their ability to support themselves[.]


 4.5 The Court finds that Kimen Fondren was granted conservatorship of the
children and may have additional expenses as a result of being the
primary caretaker.


 4.6 The Court finds that the needs of the children of the marriage justify a
disproportionate award of community property to Kimen Fondren.


 4.7 The Court finds that community indebtedness and liabilities justify a
disproportionate award of community property to Kimen Fondren.


 4.8 The Court finds that a disproportion between the earning power,
business opportunities, capacities and abilities of the spouses justify a
disproportionate award of community property to Kimen Fondren.


 4.9 Exhibit 1 attached hereto and incorporated herein sets out the Court's
factual findings regarding characterization of property, fair market
value of the assets and liabilities of the community estate and the award
of the property.


 4.10. The Court finds that a disproportionate division of the community
estate which allows Kimen Fondren to remain in the marital residence
without requiring the property to be sold is in the best interest of the
parties, including the children.


 Appellant offered expert opinion testimony at trial that the fair market value of the
Fondren home was $315,000. The trial court's findings of fact establish that it believed the
facts in the record justified a disproportionate award of the marital estate to Kimen Fondren. 
Additionally, the court found it was in the best interest of the parties and the children to allow
Kimen Fondren to remain in the home. Therefore, assuming without finding that the trial
court erred in allowing Jones's testimony regarding the value of the Fondren home, we
cannot say that such error caused the rendition of an improper judgment. See Tex. R. App.
P. 44.1. We overrule issue one. 


FINDING OF INTENTIONAL UNDEREMPLOYMENT OR UNEMPLOYMENT



 In the final decree of divorce, the trial court ordered appellant to pay child support
in the amount of $960 per month. In its findings of fact the trial court found in pertinent part:

 2.1 The Court finds that Paul Fondren's average annual income for 2005
and 2006 was $136,929.75. 


 2.2 The Court finds that Paul Fondren is intentionally unemployed or
underemployed pursuant to Texas Family Code 154.066 based on Paul
Fondren's testimony that his current estimated annual income was
approximately $30,000. 


 2.3 The Court finds that Paul Fondren is capable of earning $5000 net
monthly.


Appellant argues on appeal that the trial court's finding that he was capable of earning
$5,000 net monthly was an abuse of discretion because (1) there was no pleading that he was
underemployed; and (2) there is no evidence to substantiate the finding that he was
underemployed. 

 Appellant cites rule 47 of the Texas Rules of Civil Procedure and In re Knott, 118
S.W.3d 899 (Tex. App.--Texarkana 2003, no pet.) for the contention that variance from the
child support guidelines is an affirmative defense that must be pleaded. We do not read the
authorities cited to support this contention. The Texas Family Code provides that "[i]f the
actual income of the obligor is significantly less than what the obligor could earn because of
intentional unemployment or underemployment, the court may apply the support guidelines
to the earning potential of the obligor." Tex. Fam. Code Ann. § 154.066 (Vernon 2008). 
Nothing in the Texas Family Code requires that intentional underemployment or
unemployment be pleaded as an affirmative defense to be considered by the Court. 
Moreover, Paul failed to raise lack of pleading before the trial court and cannot raise such
pleading defect for the first time on appeal. See Tex. R. App. P. 33.1; See generally Roark
v. Stallworth Oil & Gas, Inc., 813 S.W.2d 492, 495 (Tex. 1991) ("The party who allows an
issue to be tried by consent and who fails to raise the lack of a pleading before submission
of the case cannot later raise the pleading deficiency for the first time on appeal."); see also
A.V.A. Serv's, Inc. v. Parts Indus. Corp., 949 S.W.2d 852, 853 (Tex. App.--Beaumont 1997,
no writ) ("[A] claim that the judgment is not supported by the pleadings may not be raised
for the first time on appeal.").

 Here, it is undisputed that at the time Kimen filed for divorce in August 2007 Paul
was still working for Blackwater. At the time of trial in February 2008, Paul testified that
he was unemployed, having separated from Blackwater on or about November 10, 2007. The
issue of his alleged unemployment was contested at trial. A "trial court is accorded broad
discretion in setting . . . child support payments and, absent a clear abuse of discretion, the
trial court's order will not be disturbed on appeal." In re Davis, 30 S.W.3d 609, 616 (Tex.
App.--Texarkana 2000, no pet.). "The trial court is in the best position to observe the
demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences
that cannot be discerned by merely reading the record." Norris v. Norris, 56 S.W.3d 333,
338 (Tex. App.--El Paso 2001, no pet.). Therefore, an abuse of discretion does not occur as
long as some evidence of substantive and probative character exists to support the trial
court's decision. Id. 

 Section 154.066 has "the effect of preventing a parent from evading child support by
treating the parent's earning potential as an element of [the parent's] net resources." In re
Davis, 30 S.W.3d at 616. "Intentional underemployment or unemployment" is not defined
by the Texas Family Code, however, the majority of Texas courts have interpreted the statute
to require a showing that the reduction in income was "effectuated with a design to reduce
child support payments." Id. (citing DuBois v. DuBois, 956 S.W.2d 607, 610 (Tex. App.--Tyler 1997, no writ)). Therefore, most courts require evidence that the parent reduced his
income for the purpose of decreasing his child support payments. Id. There is no
presumption that a parent is intentionally underemployed or unemployed merely because he
is no longer as lucratively employed as he was during his marriage. Id. at 616-17. In
determining whether a parent is intentionally underemployed or unemployed we must be
cognizant of their right to the pursuit of happiness. DuBois, 956 S.W.2d at 610. "The
requisite intent or lack thereof, however, may be inferred from . . . circumstances [such] as
the parent's education, economic adversities and business reversals, business background,
and earning potential." In re Davis, 30 S.W.3d at 617.

 Here, there is some evidence to support the trial court's finding that Paul was
intentionally underemployed or unemployed. Kimen testified at trial that prior to her filing
for divorce she tried to get Paul to come to some sort of agreement regarding child support
for the children and Paul told her that "you won't beat me; and if I come home and I'm a cop
in Woodville and I don't make any money you won't get anything, will you?" Kimen
testified that Paul made several remarks of this nature after he came home in November
2007. While Paul claims that he was fired from Blackwater on November 10, 2007, shortly
before he returned home Kimen testified that she only learned he had allegedly been fired
from her attorney. While Paul alleged that Kimen had called his employer and gotten him
fired, Kimen denied any such telephone call and disputed any contention that Paul had been
fired by Blackwater. Kimen testified Paul was entitled to time off from Blackwater and that
Paul "could end one contract and take six months off if he wanted to." Kimen testified that
if Paul had been terminated by Blackwater, he had not made reasonable efforts to find other
employment during the pendency of the divorce. Kimen explained that Paul had taken
several vacations since he'd been home, and that there were occasions when he said he was
in North Carolina or California looking for a job and the phone bills showed that he was
actually in Missouri visiting his girlfriend. Kimen testified that during the four months Paul
alleged he had been unemployed, he had been back and forth to Missouri to see his girlfriend
"at least ten times." 

 Kimen further testified that Paul told her at one point that he had a job. When she
accused him of intentionally not showing any income until after the divorce, Paul began to
backtrack at that point stating that he would not receive training for this new job until March
and would not begin working until April. According to Kimen, Paul told her that he would
be making $40,000 a year training troops in his new position. Kimen testified that Paul had
been offered the same position a year prior making $80,000 a year, but according to Paul,
that job was no longer available. Kimen further testified that a friend was willing to offer
Paul a job, however, Paul refused to call the friend. According to Kimen, "[Paul] planned
from the beginning to go to work when this divorce was over and that's exactly what he said
he would do and that's actually what he's doing[;] . . . I firmly believe with all my heart that
Paul's full intentions are to go back to work overseas." 

 Paul testified that he went to work for Blackwater in 2005, that he was off for two
months in 2007, and was fired from Blackwater on November 10, 2007. According to Paul
he was fired from Blackwater "[b]ecause of Kimen." The record contained no documents
indicating that Paul was fired from Blackwater. Paul testified that he made about $115,000
a year in 2003, 2004; and $150,000 a year in 2005, 2006. Paul testified that after coming
home he tried to get jobs with other companies overseas such as DynCorp, EODT and SAIC,
but speculated that his termination from Blackwater might be the reason he was not offered
employment. 

 Paul testified that he had finally received a job offer with a company called K3
Enterprises. Paul testified that he would be making $33,000 a year in his new position. Paul
entered into evidence a letter dated February 2, 2008, from the Chief Operations Officer of
K3 Enterprises, who Paul admitted was a good friend of his. The letter provides that the
company offered Paul a position as an Asymmetrical Software Instructor in the company's
training division with a base salary rate of $33,000 a year. Paul testified at trial that he
planned to accept the position. According to Paul, in his new position he would essentially
be training United States soldiers for the Department of Defense. When asked about the
$40,000 a year job that he had previously told Kimen he had gotten, Paul stated that the
company never got the contracts from the United States. 

 Paul testified that he tried every way he could to make more money. According to
Paul, he was taking online classes to get a special certification that would allow him to make
more money, but he had not yet received the certification. Paul also testified that over the
four months that he had been home and unemployed he had been looking for other jobs
overseas but had been unable to get one. Paul testified that during this time he had only been
back and forth to Missouri to see his girlfriend, "maybe three times." Paul indicated that he
was not opposed to going back overseas but if there were other opportunities in the States
he would pursue those before going back overseas and working under dangerous conditions. 
It was clear from the testimony at trial that the work Paul did overseas was dangerous work
in a dangerous environment. 

 Paul argues on appeal that the only way he could make the kind of money the trial
court found him capable of making was to go back overseas but "he hates being shot at,
blown up, and having his friends killed around him all the time," and that "[t]he Judge should
not send him back to that kind of danger." Paul testified at trial that he did not want to go
back overseas. Paul admitted, however, that he liked his job overseas and that it was a
fulfilling job. He further admitted he may have told family and friends that he enjoyed his
job overseas and that he could never come back home to be a peace officer or come back to
the Tyler area to work. Paul admitted there was nothing physically or mentally keeping him
from going back overseas to work and that while working overseas he has a much greater
earning capacity than Kimen. 

 In determining whether a trial court abused its discretion in setting child support
payments, we view the evidence in the light most favorable to the trial court's action, and
indulge every reasonable presumption in favor of the judgment. Zorilla v. Wahid, 83 S.W.3d
247, 253 (Tex. App.--Corpus Christi 2002, no pet.). As set forth above, "[i]f some probative
and substantive evidence supports the trial court's findings, the trial court did not abuse its
discretion." Id. It is apparent that the court found Kimen's testimony to be more credible
than Paul's. Kimen testified that Paul threatened to come home and take a lower paying job
so that she would not get anything. Kimen testified that the divorce was a game to Paul and
that he told her from the beginning he wasn't gong to lose. Kimen believed that Paul was
intentionally attempting to avoid earning income during the divorce proceedings and she
firmly believed that Paul planned to return to work abroad when the divorce was concluded. 
Kimen also testified that she had not called Paul's employer to get him fired from
Blackwater, and in fact she did not believe he had been fired from Blackwater. 

 While Paul testified that he planned to accept the job he had been offered with K3
Enterprises, there is nothing in the record establishing that he had in fact accepted that
position at the time of trial. Paul's arguments on appeal assume the trial court believed
Paul's assertion that he had been fired from Blackwater, where he earned $150,000 a year,
and that he would accept the job making $33,000 a year with K3 Enterprises. It was clear
from the trial court's findings, however, that the trial court found Kimen to be more credible
than Paul. Based on the record before us, we conclude there is some evidence that supports
the trial court's finding that Paul was intentionally underemployed or unemployed. Because the trial court found that Paul was intentionally underemployed or
unemployed it was appropriate for the trial court to apply Paul's earning potential to the child
support guidelines as opposed to the $33,000 a year he contended he would make after
accepting a position with K3 Enterprises. Both Kimen and Paul submitted evidence
regarding Paul's prior income before he came home in November 2007, four months prior
to the divorce proceedings. Kimen testified that when Paul began working overseas in 2002
he was making "[b]etween 4 and $5,000 a month, and then it just went up from there." 
Kimen testified that in 2006 Paul cleared $149,000 and the year before it was somewhere
around $125,000. Kimen submitted Paul's 2005 and 2006 tax returns showing the same. 
 Paul did not dispute Kimen's testimony about his 2005-2006 income, and testified that
in 2007, he earned approximately $164,000. Paul explained that he also received bonuses
of around $18,000. The trial court found Paul's average income from 2005 to 2006 was
$136,929.75. Paul does not challenge this finding on appeal. It is appropriate for the trial
court to average previous years' income in cases wherein the obligor's income fluctuates. 
See generally Norris, 56 S.W.3d at 341 ("[A] trial court must have the discretion to fashion
a child support order based on the peculiarities of the income at issue."); see also In re
Sanders, 159 S.W.3d 797, 801 (Tex. App.--Amarillo 2005, no pet.)(upholding trial court's
averaging of obligor's income for ten-year period in determining retroactive monthly
support). Based on the record before us, we find there is evidence to support the trial court's
finding that Paul was capable of earning a net income of $5,000 monthly. The trial court did
not abuse its discretion in setting child support based on that amount. We overrule issue two.

 AFFIRMED. 


 __________________________________

 CHARLES KREGER

 Justice

Submitted on February 19, 2009

Opinion Delivered July 16, 2009



Before Gaultney, Kreger, and Horton, JJ.
1. The trial court stated its ruling as follows:


 All right. My ruling is, is I am going to allow his testimony in --it may
be a credibility question as raised by the objection, but I am going to allow it
to be--I don't think--and I'll make this additional comment. I don't know that
it adds necessarily anything to what's already been presented up to this point
in that the wife has testified $235,000. There's been no objection to that
testimony. And there--testimony has been allowed that it's on the tax rolls at
$208,000. And I haven't--there's been no objection raised to that.